# IN THE SUPREME COURT OF IOWA

No. 13–1381

Filed February 13, 2015

**AHMAD S. VOSSOUGHI** and **C, N, & A, INC.,**

Appellants,

vs.

**JOSEPH A. POLASCHEK** and **MICHAEL J. MELOY,**

Appellees.

Appeal from the Iowa District Court for Scott County, David H. Sivright Jr., Judge.

Plaintiffs appeal from an adverse summary judgment ruling dismissing legal malpractice claims against two attorneys. **REVERSED AND REMANDED.**

Steven E. Ballard and Michael J. Harris of Leff Law Firm, L.L.P, Iowa City, for appellant.

Robert V.P. Waterman Jr. and Joshua J. McIntyre of Lane & Waterman, LLP, Davenport, for appellee Polaschek.

John T. Flynn of Brubaker, Flynn & Darland, P.C., Davenport, for appellee Meloy.

**HECHT, Justice.**

Vossoughi and a company owned by him brought this legal malpractice action against attorneys who prepared documents in connection with the sale of real and personal property. Vossoughi appeals from a district court ruling granting summary judgment to both attorneys. Because we conclude the summary judgment should not have been granted in favor of either attorney, we reverse and remand for further proceedings.

## I. Factual Background and Proceedings.

A reasonable fact finder viewing the evidence in the light most favorable to Vossoughi and C, N, & A, Inc. could find the following facts from the summary judgment record. Ahmad Vossoughi was the sole owner of C, N, & A, Inc. The company owned and operated Cigarette Oasis, LLC (Oasis). Oasis was located on real estate Vossoughi owned in Davenport, Iowa. In September 2006, Vossoughi and C, N, & A, Inc. entered into a set of agreements with Mark Polaschek (Mark), who managed BVM Enterprises LLC (BVM) and PPM Properties, Inc. (PPM). The contracting parties were represented by counsel; Vossoughi and C, N, & A, Inc. were represented by Michael J. Meloy, and Mark was represented by his brother Joseph Polaschek (Polaschek).

After five or six hours of negotiations, the parties executed three separate agreements on September 15, 2006: (1) an "Asset and Business Name Purchase Agreement," setting out that BVM would pay C, N, & A, Inc. the sum of $261,281.98 to acquire Oasis; (2) a "Noncompetition Agreement," requiring PPM to pay Vossoughi an additional $70,000; and

(3) a "Real Estate Contract," setting out that PPM would pay Vossoughi $40,000 for the real property.[1]

An "Addendum to the Real Estate Contract" contained language purporting to cross-collateralize the three agreements. Paragraph 3 of the addendum provided that any default under the Noncompetition Agreement or Asset and Business Name Purchase Agreement would also constitute default under the Real Estate Contract. Paragraph 5 of the addendum authorized PPM to prepay the balance due on the Real Estate Contract without penalty, but provided that the payment obligations under the other two agreements would remain secured by the real property until fully paid.[2] Paragraph 6 of the addendum included the following language addressing the consequences of prepaying the real estate purchase price:

> If Buyer elects to prepay under the terms of this real estate purchase contract, Seller shall convey the real property to Buyer subject to the full payment of said contract and expressly subject in the warranty deed for said conveyance stating that the Buyer is restricted and can sell said real estate only upon the full payment and completion of the terms of the Non-compete Agreement and the Asset Purchase Agreement.
>
> If the Buyer is unable to re-convey the real property in the event of default by Buyer of either the Non-competition Contract or the Asset Purchase Agreement, then the Buyer and Seller agree that the value of damages would be difficult if not impossible to calculate at this time and as such, the Buyer shall be obligated to pay to Seller as liquidated

---

[1] The contract called for a $10,000 down payment. The $30,000 balance was to be paid in monthly installments over the next twenty years.

[2] Paragraph 5 read, in part, as follows:

> In the event that the Buyer sells, assigns or pays off this contract before the due date, Buyer shall remain responsible to re-convey the real property in the event there is any default on either the Non Competition Contract or on the Asset and Business Name Purchase Agreement.

damages on the failure of the Buyer to re-convey the "market value" on the real property with any improvements.

Vossoughi believed the payments due on all three of the agreements were secured by a lien on the real property created by language in the addendum. However, the agreements and addendum did not provide for perfection of a security interest securing the sellers' interests in the personal property, nor did they provide for a mortgage against the real estate securing the contractual right to receive payments under two of the agreements in the event PPM exercised its right to prepay the purchase price on the real estate contract.

The buyers took possession of Oasis and the real property, and began making installment payments to Vossoughi. Six months later, in March 2007, Mark contacted Meloy, stating he wanted to pay in full the balance owed on the real estate contract. On March 28, 2007, Meloy contacted Vossoughi and informed him of Mark's offer to prepay the real estate contract obligation. When told there would be a fee for Meloy's legal services in connection with the closing of the real estate transaction, Vossoughi terminated the attorney–client relationship. Meloy did no further work for Vossoughi or C, N, & A, Inc.

Vossoughi appeared the very next day at Polaschek's office and executed a warranty deed transferring title to the real estate to PPM. Polaschek had prepared the deed, and he charged Vossoughi $500 for his legal services. Vossoughi told Polaschek he was concerned the warranty deed contained no reference to the cross-collateralizing language of the addendum and no mention of the buyers' remaining payment obligations under the other two agreements. Polaschek assured Vossoughi that after he signed the warranty deed, an additional page incorporating the provisions of the addendum would be added to ensure

the remaining payment obligations would remain secured by the real property. Vossoughi signed the warranty deed, and despite Polaschek's promises, the deed was later recorded *without* any additional language and without a second page referencing the cross-collateralized agreements.

In February 2008, the buyers stopped making payments on the two other contract obligations. Vossoughi's investigation revealed the warranty deed he signed had been recorded on April 9, 2007, without the additional page incorporating the provisions of the addendum. Worse yet, Vossoughi discovered Mark had borrowed $184,000 from American Bank & Trust Company and secured the loan with a mortgage on the Oasis real estate.

Vossoughi and C, N, & A, Inc. filed a breach of contract action against BVM, PPM, and Mark. The action produced no remedy for the plaintiffs, however, because BVM had already been involuntarily dissolved by the Illinois Secretary of State, and both PPM and Mark had filed for bankruptcy under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 701–84 (2006). American Bank & Trust foreclosed its mortgage.

Vossoughi and C, N, & A, Inc. filed a petition in the bankruptcy court seeking a determination that the contract obligations of PPM and Mark arising from the Asset and Business Name Purchase Agreement and the Noncompetition Agreement were nondischargeable in bankruptcy. The bankruptcy court denied the requested relief, however, because it found no evidence the debtors had committed any malicious or fraudulent act within the meaning of 11 U.S.C. § 523(a)(2) or (6). Accordingly, the bankruptcy court ruled the debts arising from the two agreements were dischargeable. *See Vossoughi v. Polaschek* (*In re Polaschek*), No. 08–81311, 2012 WL 1569611, at *8 (Bankr. C.D. Ill. May

3, 2012). Vossoughi and C, N, & A, Inc. were left with $210,000 in unsecured, nonpriority, fully dischargeable claims—and took nothing from the bankruptcy.

Vossoughi and C, N, & A, Inc. filed a petition alleging legal malpractice claims against both Meloy and Polaschek on June 16, 2010. The petition asserted the defendant attorneys were negligent in connection with the preparation of the warranty deed and conveyance in March 2007. After Meloy filed an affidavit disclaiming any involvement in the March 2007 transaction, Vossoughi dismissed the action against Meloy without prejudice on April 18, 2011.

Vossoughi and C, N, & A, Inc. sued Meloy a second time, however, on June 26, 2012. In an amended petition filed in this action, the plaintiffs alleged Meloy negligently performed legal services in negotiating, drafting, and providing legal advice in connection with the three agreements executed in September 2006.[3] Each of the defendants filed a motion for summary judgment.

## II. Summary Judgment on Claims Against Meloy.

Meloy's motion for summary judgment raised the statute of limitations as an affirmative defense. The district court found this defense meritorious and granted summary judgment. The district court noted the limitations period of five years for legal malpractice actions does not begin to run until the plaintiff discovers the injury. *See* Iowa Code § 614.1(4) (2005); *Venard v. Winter*, 524 N.W.2d 163, 166 (Iowa 1994); *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985). However, the district court held the plaintiffs were deemed to have

---

[3]Because Vossoughi filed the second petition against Meloy more than six months after dismissing the first petition, the present claim is not considered a continuation of the same action under Iowa Code section 614.10 (2005).

discovered the injury on March 29, 2007, when Vossoughi signed the warranty deed. The discovery occurred on that date, the district court concluded, because Vossoughi's signature on the deed imputes to him knowledge of the deed's contents. *See Huber v. Hovey*, 501 N.W.2d 53, 55 (Iowa 1993) ("[F]ailure to read a contract before signing it will not invalidate the contract. Absent fraud or mistake, ignorance of a written contract's contents will not negate its effect." (Citation omitted.)).

The district court further held in the alternative that the plaintiffs discovered the injury when the warranty deed was recorded on April 9, 2007. *See* Iowa Code § 558.55 ("[T]he filing and indexing [of deeds in the recorder's office] shall constitute constructive notice to all persons of the rights of the grantees conferred by the instruments."). Thus, the district court concluded the limitations period for filing the instant claim against Meloy expired on either March 29, 2012, or April 9, 2012, and granted summary judgment to Meloy because the plaintiffs' petition asserting the instant claim against him was not filed until June 26, 2012.

The plaintiffs filed a motion to amend the court's ruling, contending there was no injury as a result of Meloy's actions in drafting the original agreement until Mark and PPM stopped making payments in February 2008. The motion asserted that although Meloy's negligence may have left the contract payment obligations unsecured as early as September 2006, the failure to secure the sellers' interests represented only a prospect of future harm at that point, and a mere prospect of harm could not have given rise to an actionable claim for legal malpractice. The district court considered this argument, but rejected it:

> [T]he Iowa Supreme Court . . . has adopted the rule that the date of injury "coincides with the last possible date when the attorney's negligence became irreversible." *Neylan v. Moser*, 400 N.W.2d 538, 542 (Iowa 1987). In *Neylan*, the Court was

distinguishing between the date of an adverse trial court verdict and the date of its final appeal, deciding the statute of limitations was tolled until the later date. *Id.* Applying this rule here, any negligence by Meloy became "irreversible" when the deed was signed and recorded. At that point, plaintiffs became insecure and had no remedy in the event the buyers defaulted. Thus, based on the holding in *Neylan*, the statute of limitations commenced to run in April 2007.

### III. Summary Judgment on Claims Against Polaschek.

Polaschek's motion for summary judgment asserted his acts and omissions could not have been the cause of any damages. Even if it is assumed he breached his duty by recording the warranty deed without incorporating the restrictive terms of the addendum, Polaschek posited the only consequence was the unavailability of the addendum's liquidated damages remedy. The bankruptcy discharges of the plaintiffs' contract claims were, Polaschek contended, independently sufficient causes of their inability to collect damages.

The district court granted Polaschek's motion, reasoning that a judgment in favor of Vossoughi and C, N, & A, Inc. would not have been collectible absent Polaschek's alleged negligence. Because it determined any judgment entered against Mark or PPM would have been uncollectible as a consequence of their bankruptcy discharges, the district court concluded any breach of duty by Polaschek could not have been a "but for" cause of the claimed damages.

Vossoughi and C, N, & A, Inc. appealed, and we retained the appeal.

### IV. Standard of Review.

We review the district court's summary judgment ruling to correct errors at law. *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 500 (Iowa 2013); *SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 584 (Iowa 2002). Summary judgment is appropriate when the moving

party demonstrates that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Boelman*, 826 N.W.2d at 501; *Murtha v. Cahalan*, 745 N.W.2d 711, 713 (Iowa 2008). We afford the nonmoving party "every legitimate inference that can be reasonably deduced from the evidence"—and if the review of the evidence pertaining to a particular issue shows "reasonable minds can differ on how the issue should be resolved," an order entering summary judgment on that issue must be vacated or reversed. *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 771 (Iowa 2009).

**V. Analysis.**

**A. Claims Against Meloy.** We first turn to the question of whether the district court correctly ruled the claims of Vossoughi and C, N, & A, Inc. against Meloy are time-barred. To resolve this issue, we must determine when the injuries claimed by Vossoughi and C, N, & A, Inc. gave rise to a cause of action. If the cause of action accrued more than five years before the plaintiffs filed their amended petition against Meloy on June 26, 2012, we must then evaluate whether the discovery rule extended the limitations period.

1. *Actual injury.* Legal malpractice claims sound in negligence. Claims based on negligence do not accrue, and the statute of limitations does not begin to run, until the injured plaintiff "has actual or imputed knowledge of all the elements of the action." *Franzen*, 377 N.W.2d at 662; *accord Buechel v. Five Star Quality Care, Inc.*, 745 N.W.2d 732, 736 (Iowa 2008); *Stanley L. & Carolyn M. Watkins Trust v. Lacosta*, 92 P.3d 620, 628 (Mont. 2004) ("[T]he statute of limitations in a legal malpractice action does not begin to run until . . . all elements of the legal malpractice claim, including damages, have occurred."). To establish a prima facie claim of legal malpractice, the plaintiff must produce

evidence showing the attorney's breach of duty caused "actual injury, loss, or damage." *Ruden v. Jenk*, 543 N.W.2d 605, 610 (Iowa 1996). Until the attorney's act or omission that breached the applicable duty "produces injury to claimant's interest by way of loss or damage, no cause of action accrues." *Wolfswinkel v. Gesink*, 180 N.W.2d 452, 456 (Iowa 1970). The injury must be concrete; "an essential element to a legal malpractice cause of action is proof of actual loss rather than a breach of a professional duty causing . . . speculative harm, or the threat of future harm." 7A C.J.S. *Attorney & Client* § 303, at 337 (2004). No matter what the plaintiffs knew or when they knew it, the statute of limitations could not have begun to run any earlier than the date an actual injury occurred.

The district court relied on *Neylan* in concluding the date of the plaintiffs' injuries was either March 29, 2007 (the date the deed was executed), or April 9, 2007 (the date the deed was recorded), and in concluding this action against Meloy was time-barred. The plaintiffs in *Neylan* brought a legal malpractice action alleging their attorneys had "negligently failed to present adequate evidence to support [the plaintiffs'] claim of damages" at trial. *Neylan*, 400 N.W.2d at 542. In the malpractice action, the plaintiffs sued their attorneys for the damages they believed should have been recoverable. *Id.* The defendants asserted the district court's decision entered against their former clients prior to appeal "should mark the time when a legal malpractice cause of action accrue[d], because the claimant [was] then formally advised of an adverse ruling and resulting damage." *Id.* However, we adopted a different view and held the legal malpractice claim accrued when this court affirmed the trial court's decision on appeal. *Id.* At that moment, when all avenues to recovery were exhausted and the underlying claims were

extinguished, the injury caused by the alleged breach of duty became actual rather than potential. *See id.*

Our decision in *Neylan* was undergirded by the principle that each client "has a 'right to rely upon the superior skill and knowledge of his attorney'" until that reliance results in actual injury. *Id.* (quoting *Millwright v. Romer*, 322 N.W.2d 30, 34 (Iowa 1982)). We also reasoned a litigant who believes she may have been injured through her attorney's negligence should not be forced to choose between (a) sabotaging her relationship with her attorney during ongoing representation by filing a legal malpractice claim, and (b) waiving her opportunity to bring the claim before the statute of limitations extinguishes it. *Id.*; *accord Dudden v. Goodman*, 543 N.W.2d 624, 629 (Iowa Ct. App. 1995) ("[I]t would be palpably unjust and quite unreasonable to require a client of a lawyer to obtain a second opinion on every professional decision the lawyer makes."); *see also Amfac Distrib. Corp. v. Miller*, 673 P.2d 795, 799 (Ariz. Ct. App.) ("Under our rule, a client will not have to challenge and question every decision made by his attorney or routinely double check his attorney's conduct . . . . Thus, the client will have peace of mind to allow the legal process to work fully and finally in hopes that his position will ultimately be vindicated and will not be forced to disrupt his relationship with his lawyer to preserve what he thinks may be a valid malpractice claim."), *approved as supplemented*, 673 P.2d 792 (Ariz. 1983) (en banc).

We conclude *Neylan* does not justify summary judgment in Meloy's favor under the circumstances presented here. The core teaching of *Neylan* is that speculative injury does not give rise to a legal malpractice claim. *See Neylan*, 400 N.W.2d at 542. An injury arising from legal malpractice is actionable when it is actual but not when it is merely

potential. *See, e.g.*, *Huber v. Watson*, 568 N.W.2d 787, 790 (Iowa 1997) (requiring as an element of legal malpractice that "the [client] sustained *actual* injury, loss, or damage" (emphasis added)); *Ruden*, 543 N.W.2d at 610 (same); *Vande Kop v. McGill*, 528 N.W.2d 609, 611 (Iowa 1995) (same); *Schmitz v. Crotty*, 528 N.W.2d 112, 115 (Iowa 1995) (same); *Dessel v. Dessel*, 431 N.W.2d 359, 361 (Iowa 1988) (same); *Burke v. Roberson*, 417 N.W.2d 209, 211 (Iowa 1987) (same). To be sure, *Neylan* did not establish that a legal malpractice claim accrues when a client has not yet suffered actual injury. *See Neylan*, 400 N.W.2d at 542.

Many other jurisdictions follow this rule. *See, e.g.*, *Greater Area Inc. v. Bookman*, 657 P.2d 828, 829 n.3 (Alaska 1982) ("[I]f the client discovers his attorney's negligence before he suffers consequential damages, the statute of limitations will not begin to run until the client suffers actual damages."); *Amfac Distrib. Corp.*, 673 P.2d at 798–99 (adhering to "the time-honored principles of law which require that the plaintiff be damaged or injured in some way as a predicate to bringing an action for negligence"); *Jordache Enters., Inc. v. Brobeck, Phleger & Harrison*, 958 P.2d 1062, 1070 (Cal. 1998) ("The mere breach of a professional duty, causing only . . . speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence."); *Romano v. Morrisroe*, 759 N.E.2d 611, 614 (Ill. App. Ct. 2001) ("No cause of action accrues without actual damages, and damages are only speculative if their existence itself is uncertain."); *Pancake House, Inc. v. Redmond*, 716 P.2d 575, 579 (Kan. 1986) (recognizing one theory of accrual is that "the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his lawyer's conduct"); *Mass. Elec. Co. v. Fletcher, Tilton & Whipple, P.C.*, 475 N.E.2d 390, 391 (Mass. 1985)

("[T]he electric companies knew immediately of the alleged negligence of the defendant attorneys, but it was not then clear that the alleged negligence had caused or would cause the companies any appreciable harm."); *Watkins Trust*, 92 P.3d at 630 ("[T]he mere threat of future harm does not constitute actual damages."); *Semenza v. Nev. Med. Liab. Ins. Co.*, 765 P.2d 184, 186 (Nev. 1988) ("[W]here damage has not been sustained or where it is too early to know whether damage has been sustained, a legal malpractice action is premature . . . . [I]t follows that a legal malpractice action does not accrue until the plaintiff's damages are certain and not contingent."); *Grunwald v. Bronkesh*, 621 A.2d 459, 464–65 (N.J. 1993) ("[T]he statute of limitations begins to run only when the client suffers actual damage . . . . Actual damages are those that are real and substantial as opposed to speculative."); *Jaramillo v. Hood*, 601 P.2d 66, 67 (N.M. 1979) ("[T]he cause of action accrues when actual loss or damage results . . . ."); *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998) ("An essential element to [legal malpractice] is proof of actual loss rather than a breach of a professional duty causing only . . . speculative harm or the threat of future harm."); *Ameraccount Club, Inc. v. Hill*, 617 S.W.2d 876, 878 (Tenn. 1981) ("The Court of Appeals erred in holding that the plaintiff's cause of action accrued and the statute of limitations began to run when the plaintiff became aware of the negligence of the defendant attorneys; still more was required, viz., damage or injury to the plaintiff resulting from that negligence."); *Hennekens v. Hoerl*, 465 N.W.2d 812, 816 (Wis. 1991) ("A tort claim is not 'capable of present enforcement' until the plaintiff has suffered actual damage. . . . Actual damage is not the mere possibility of future harm.").

We also find support for the principle that a legal malpractice claim does not arise until actual injury results in the Restatement (Third) of the

Law Governing Lawyers, which focuses on pragmatic policy concerns like those we found persuasive in *Neylan*:

> [T]he statute of limitations does not start to run until the lawyer's alleged malpractice has inflicted significant injury. For example, if a lawyer negligently drafts a contract so as to render it arguably unenforceable, the statute of limitations does not start to run until the other contracting party declines to perform or the client suffers comparable injury. Until then, it is unclear whether the lawyer's malpractice will cause harm. Moreover, to require the client to file suit before then might injure both client and lawyer by attracting the attention of the other contracting party to the problem.

Restatement (Third) of the Law Governing Lawyers § 54 cmt. *g*, at 406 (2000).

The statute of limitations cannot require legal malpractice claims to be brought while "the record is uncertain and speculative whether a party has sustained damages." *Crookham v. Riley,* 584 N.W.2d 258, 266 (Iowa 1998). Put another way, the statute of limitations cannot sensibly be applied in a way that forces parties to file suit before an actual injury has been sustained on penalty of losing the opportunity to file a claim at all. *See Cannon v. Sears, Roebuck & Co.*, 374 N.E.2d 582, 584 (Mass. 1978). Accordingly, we reaffirm the statute of limitations does not begin to run on a legal malpractice claim until the cause of action accrues. The cause of action accrues when the client sustains an actual, nonspeculative injury and has actual or imputed knowledge[4] of the other elements of the claim. *Franzen,* 377 N.W.2d at 662 ("[T]he statute of limitations does not begin to run until the injured person has actual or

---

[4]Knowledge could be imputed through the doctrine of inquiry notice. We have said "[t]he [limitations] period begins at the time the [plaintiff] is on inquiry notice." *Franzen*, 377 N.W.2d at 662. "A party is placed on inquiry notice when a person gains sufficient knowledge of facts that would put that person on notice of the existence of a problem or potential problem." *Buechel*, 745 N.W.2d at 736.

imputed knowledge of *all* the elements of the action." (Emphasis added.));
*see Watkins Trust*, 92 P.3d at 628.

2. *Whether insecurity constitutes an actual injury.* The question remains, however, whether the plaintiffs' insecurity arising from the absence of a mortgage lien against the real estate and a perfected security interest in the personal property constituted an actual injury. We hold insecurity alone does not constitute an actual injury. Until Mark and PPM stopped making payments in February 2008, it was entirely possible the plaintiffs would have continued collecting contract payments without disruption. Accordingly, it was entirely possible the decision to structure the transaction without the protection of a mortgage on the real estate or a perfected security interest in the personal property would cause the sellers no actual injury. *See* 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series: Lawyer and Judicial Ethics* § 13:2(b)(2), at 1088 (2014) ("[U]ntil the final bell is rung and the match is truly over, the possibility persists that an unsatisfactory outcome could be avoided . . . because an opponent fails to take advantage of the error."); *see also David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117–18 (3d Cir. 1994) (determining when an attorney negligently structured a business acquisition transaction by failing to preserve Lilly's "small business eligibility," a legal malpractice claim did not accrue until several years later when a competitor challenged Lilly's small business status); *Fritz v. Ehrmann*, 39 Cal. Rptr. 3d 670, 676 (Ct. App. 2006) (finding a promissory note with negligently drafted prepayment and interest provisions created only speculative injury because the promisors "might never have had the funds or the inclination to prepay principal, and they might have paid . . . without regard to any ambiguity" in the document). In other words, until the

payments stopped, the plaintiffs suffered only the prospect of future harm. *See Rayne State Bank & Trust Co. v. Nat'l Union Fire Ins. Co.*, 483 So. 2d 987, 995 (La. 1986) ("Damage was not sustained by the bank by virtue of the mere existence of defects in the mortgages. At this point, the possibility of damage to the bank was merely speculative, uncertain and contingent on the possibility of an attack on the validity of the mortgages by a third party, or on the possibility that the debtors would declare bankruptcy. In the event that neither of these contingencies occurred, and the debtors continued payment of their indebtedness, no harm at all would have resulted to the bank."); *see also Dearborn Animal Clinic, P.A. v. Wilson*, 806 P.2d 997, 1003 (Kan. 1991) ("[T]he alleged negligent act of Wilson occurred at the time he prepared the . . . agreement, and arguably the plaintiffs suffered injury at that time when they did not get the agreement that Dearborn hired Wilson to prepare. However, no *actionable* injury had occurred because [a third party] might have elected to exercise his option in which case the plaintiffs would have suffered no injury even though Wilson was negligent in preparing the agreement." (Emphasis added.)); *cf. Callahan v. Gibson, Dunn & Crutcher LLP*, 125 Cal. Rptr. 3d 120, 133–34 (Ct. App. 2011) (finding no actual injury arose from an executed partnership agreement until its negligently drafted succession provisions became operative).

An Idaho case provides an apt illustration. In *Parsons Packing, Inc. v. Masingill*, 95 P.3d 631, 632–33 (Idaho 2004), the plaintiff alleged its attorney had negligently failed to draft an effective security agreement and failed to file a financing statement to secure its interest in debtor Pro-Ag's industrial onion bins. The Idaho Supreme Court determined the abstract and theoretical injury Parsons suffered from being placed in a weaker position by the attorney's failure to secure its interest in the

collateral was not the injury that truly gave rise to the legal malpractice claim, and thus was not the injury that controlled the applicable statute of limitations. *See id.* at 634. Rather, the requisite injury—which, under Idaho law, is "some damage"—only occurred when Pro-Ag defaulted and recovery became impossible:

> Parsons entered into the Agreement as part of a normal lease and sale transaction and had Pro–Ag not defaulted, each party would have received the intended benefit of the bargain. The onion bins were exchanged for a promise on the part of Pro–Ag to make the agreed payments, which they did until 1998. Although it is true that steps could have been taken to secure Parsons' interest in the bins in the event of Pro–Ag's insolvency, bankruptcy was not contemplated and would have been mere speculation in 1992 when the Agreement was executed. Although they were subjected to a greater risk, the Parsons were not damaged by the lack of security in the bins until Pro–Ag's bankruptcy. . . . For application of the statute of limitation some damage did not occur in 1992. Some damage occurred the date of default, April 14, 1998.

*Id.*

A Kentucky Supreme Court decision provides another relevant illustration of the importance of actual injury in our analysis:

> In April and again in October of 1990, appellee Wheatley conducted a title examination relating to certain real property upon which appellant proposed to make a first mortgage loan to its customers, the Pearmans. His opinion failed to disclose a recorded mortgage. Within a few months after the loan was made, the Pearmans defaulted and appellant commenced preparations to bring an action to enforce its mortgage lien. The prior mortgage lien was then discovered and appellant realized that its loan might be in jeopardy.

> . . . .

> In the present case, the time allowed [for the filing of the legal malpractice action] began to run as of the date of the foreclosure sale. Prior to that date, Appellants had only a fear that they would suffer a loss on the property. Their fear was not realized as damages until the sale of the property in June of 1992. At that time, what was merely

> probable became fact, and thus commenced the running of the statute.

*Meade Cnty. Bank v. Wheatley*, 910 S.W.2d 233, 234–35 (Ky. 1995). Here, even after the deed from Vossoughi to PPM was recorded, the plaintiffs' injuries were merely speculative because Mark and PPM continued to make payments, and may have continued to do so until their obligations under the Noncompetition Agreement and Asset and Business Name Purchase Agreement were satisfied. The plaintiffs' injuries became actual and nonspeculative no earlier than February 2008, when Mark and PPM stopped making payments.[5] "At that time, what was merely probable became fact . . . ." *Id.*; *see also Pioneer Nat'l Title Ins. Co. v. Sabo*, 432 F. Supp. 76, 76–77, 79, 81–82 (D. Del. 1977) (finding an insurance company whose hired attorney negligently drafted a title insurance policy to expand the insurance company's liability suffered injury not when the policy was initially issued, but later, when the overinclusive coverage was actually implicated); *Jeansonne v. Att'y's Liab. Assurance Soc'y*, 891 So. 2d 721, 728 (La. Ct. App. 2004) ("Mr. Jeansonne did not sustain damages by the mere existence of the alleged defects in the Promissory Note and Stock Purchase Agreement . . . . The possibility of damage to Mr. Jeansonne was merely speculative, uncertain and contingent on the clause Mr. Jeansonne believed was incorporated into the promissory note and stock purchase agreement. In

---

[5]Moreover, because Vossoughi could potentially have recovered the balance of the payment obligations on the remaining two agreements through his action against Mark and PPM for breach of contract, the actual injury might not have arisen until Mark and PPM filed for bankruptcy on May 15, 2008. But further analysis on this temporal question is unnecessary; whether the actual injury occurred in February 2008 when the payments stopped, in May 2008 when Mark and PPM filed for bankruptcy, or even at some later time—perhaps when the bankruptcy court discharged Vossoughi's contract claims—the amended petition against Meloy on June 26, 2012 was indisputably timely.

the event that this contingency did not occur, no harm at all would have resulted . . . .").[6]

3. *The discovery rule.* The discovery rule can extend the applicable deadline for filing legal malpractice actions. It is "an ameliorative device favoring the right to bring suit" in situations where laypeople rely on professionals and later discover misplaced reliance caused injury. *Poole v. Lowe,* 615 A.2d 589, 592 (D.C. 1992)). "The rule is based on the theory that a statute of limitations should not bar the remedy of a person who has been excusably unaware of the existence of the cause of action." *Franzen,* 377 N.W.2d at 662.

---

[6]We acknowledge a few courts have decided insecurity alone constitutes an actual injury for claim accrual purposes. *See Ladner v. Inge*, 603 So. 2d 1012, 1015 (Ala. 1992) (concluding the plaintiff suffered an actual injury "when she accepted . . . unsecured promissory notes" in exchange for real estate); *Vision Mortg. Corp. v. Patricia J. Chiapperini, Inc.*, 722 A.2d 527, 530 (N.J. 1999) (per curiam) ("[T]he cause of action should accrue when the mortgagee knows or has reason to know that its collateral has been impaired or endangered by the negligen[ce] . . . ."). However, we do not find *Ladner* persuasive, and we choose instead to follow the numerous authorities we have cited above holding negligently-drafted documents must cause an actual injury more tangible than insecurity before a legal malpractice claim accrues.

Further, our decision today is consistent with *Vision Mortgage*. The issue decided there was when the *complete cause of action* accrued, not merely when the element of actual injury occurred. *See Vision Mortg. Corp.*, 722 A.2d at 529–30. The elements of any negligence claim are (1) existence of a duty, (2) breach of that duty, (3) causation, and (4) damages. *Ruden*, 543 N.W.2d at 610; *see also, e.g., Raas v. State*, 729 N.W.2d 444, 447 (Iowa 2007); *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 774 (Iowa 2006); *Trobaugh v. Sondag*, 668 N.W.2d 577, 580 n.1 (Iowa 2003). In *Vision Mortgage*, the court concluded a lender's negligence claim accrued when a second appraisal revealed the possibility that a previous appraisal was negligently performed by the defendant. *Vision Mortg. Corp.*, 722 A.2d at 530. It is crucial to note, however, that the second appraisal was obtained long *after* the borrowers defaulted and actual injury was suffered by the plaintiff. *See id.* at 528, 530 (noting the borrowers defaulted in 1989, yet the claim did not accrue until 1991). In other words, the lender suffered actual injury (element 4) when the borrowers defaulted, but did not discover that injury was caused by negligence (elements 1 and 2) until much later. Thus, *Vision Mortgage* stands for the proposition that a negligence claim accrues when all the elements of the negligence claim are provable. *Id.* at 530. We follow the same rule here.

However, the discovery rule only lengthens the time to file. *See Millwright*, 322 N.W.2d at 33. Because the plaintiffs did not suffer a concrete injury before Mark and PPM stopped making payments in February 2008, the amended petition filed in June 2012 by Vossoughi and C, N, & A, Inc. asserting claims against Meloy was plainly not time-barred. Therefore, the timeliness of the plaintiffs' action is clearly established, and the discovery rule is inapplicable in this case.

4. *Disposition of claims against Meloy.* Until at least February 2008, Vossoughi and C, N, & A, Inc. had suffered only the prospect of potential future harm. When they actually suffered damage, their claims accrued and only then did the limitations period begin to run. Because they filed their amended petition against Meloy in June 2012, we conclude their claims are not time-barred. The district court erred in granting summary judgment to Meloy.

**B. Claims Against Polaschek.** Turning to the second issue before us, we are asked to determine whether the district court correctly ruled Polaschek's failure to include in the deed the substance of the addendum and record the deed with those additions was, as a matter of law, not a factual cause of the plaintiffs' damages. To satisfy the "proof of causation" requirement in legal malpractice cases, plaintiffs must often make a "showing of the money or rights that the plaintiff would have collected in the absence of the lawyer's negligence, which we [have] referred to as proof of 'collect[a]bility.' " *Woods v. Schmitt*, 439 N.W.2d 855, 864 (Iowa 1989) (quoting *Burke*, 417 N.W.2d at 212). The district court granted Polaschek's motion for summary judgment based on the conclusion that Mark and PPM's bankruptcy would have prevented the plaintiffs from recovering anything from the buyers' default even absent any alleged legal malpractice. Put another way, the district court

concluded the plaintiffs cannot show Polaschek's acts or omissions caused any damage and therefore cannot state a claim for legal malpractice.

In resolving this issue, we consider whether a reasonable fact finder could find on this record that if Polaschek had incorporated the substance of the addendum with the deed as he promised (and recorded it), American Bank & Trust might not have loaned money to Mark and taken a mortgage on the real estate. We further consider whether the fact finder could find that if the real estate had not been mortgaged to American Bank & Trust as a consequence of the recording, the contract forfeiture remedy could have been available to prevent or mitigate the plaintiffs' losses.

Collectability need not be shown if a plaintiff alleges legal malpractice directly caused actual loss; but collectability is a critical element of any legal malpractice claim alleging legal malpractice *prevented the plaintiff's recovery*. This distinction is illustrated best by *Pickens, Barnes & Abernathy v. Heasley*, 328 N.W.2d 524, 525 (Iowa 1983), in which we addressed an appeal from a jury verdict awarding damages to Heasley for legal malpractice. Heasley claimed damages arising from the defendant lawyers' legal malpractice during a prior trial. *Id.* at 525. In particular, Heasley alleged her former lawyers negligently prosecuted her underlying claim and caused her to fail to recover, and negligently defended against a counterclaim and caused her to pay damages on it. *See id.* The district court refused in the malpractice action to instruct the jury as to any collectability requirement, and Heasley "did not introduce substantial evidence from which a jury could reasonably find that a judgment [in her favor in the underlying action] would [have] be[en] collectible in full or in an ascertainable part." *Id.* at

526. We noted the district court's failure to instruct the jury on collectability did not invalidate the jury verdict or the damages award on the counterclaim because actual loss from negligent defense against the counterclaim had been shown in the amount that Heasley had paid in damages. *Id.* at 526–27. But we reversed and granted the defendants' motion for judgment notwithstanding the verdict as it pertained to lost recovery stemming from negligent handling of Heasley's underlying claim because "when the loss arises from negligently *prosecuting* a prior case the client has the burden of proving not only the amount of the judgment he would have *obtained* but for the negligence, but also what he would have *collected.*" *Id.* at 525–27.

Accordingly, under the rule stated in *Pickens*, Vossoughi and C, N, & A, Inc. have a burden at trial in this case to prove by a preponderance of the evidence that the negligence of Meloy, Polaschek, or both caused the plaintiffs' inability to recover contract damages from Mark, PPM, or both. In other words, the plaintiffs in this case must produce evidence "affording a reasonable basis for ascertaining the loss." *Id.* at 526. But to withstand the defendants' motions for summary judgment, the plaintiffs need only engender a genuine dispute of material fact on the collectability issue.

"[I]t is a rare case when an issue of collect[a]bility in a malpractice case is so clear that it can be decided as a matter of law." *Burke*, 417 N.W.2d at 213; *see also Crookham*, 584 N.W.2d at 265 ("It is well established the questions of negligence . . . and proximate cause are generally for the jury and only in exceptional cases can they be decided as a matter of law."). We conclude the parties' conflicting expert testimony bearing upon collectability engendered a genuine dispute of material fact on this issue. Vossoughi's resistance to Polaschek's motion

for summary judgment relied in part on deposition testimony from expert witness Elaine Gray:

> Q: . . . [I]ncluding the requested language from the contracts wouldn't have been sufficient to create a lien on the Oasis property, correct? A: Correct, but it may also have deterred any other lien from being perfected on the Oasis property.

> Q: And what do you mean by that? A: If I were examining an abstract for a bank who wished to take a first priority security interest in property and included in a warranty deed was language restricting the owner's ability to sell, I don't believe that if I set that information out, the bank would have believed themselves to be secure in the first priority and would therefore not likely have granted a mortgage against the property, at least without further showing as to what was required to negate the ability or the restriction on sale.

Polaschek supported his motion for summary judgment in part with testimony of his own expert witness, Stephen T. Hunter. Hunter opined Polaschek's failure to record the addendum caused no injury because even if it had been recorded, the addendum would not have prevented Mark from mortgaging the property.

After reading Hunter's opinion on causation, Gray responded that no matter the legal effect, the practical consequences of recording the addendum or its substance with the deed may have been different. Specifically, Gray opined recording would have created a practical impediment to a bank considering a loan based on the property as collateral:

> Q: . . . [T]he final sentence [of Hunter's report states], "The mortgage of the real estate by the buyer is not restricted by such omitted language by its terms as affirmed in the opinion." A: From a legal standpoint, I think that's true; but from a practical standpoint, I think a mortgage is restricted.

> Q: And what do you mean by that? A: Again, my involvement with banks is that they are very conservative

about lending money against collateral in which they may not have a clearly defined first priority security interest; and, in my opinion, had Mr. Polaschek or one of his companies obtained that real estate with that language in the deed, which would in turn have been included in the abstract, the proper opinion to a bank would not enable an attorney to pass on title . . . if what the bank wanted to do was obtain a clearly defined first priority security interest.

We conclude Gray's deposition testimony engenders a genuine dispute of material fact on the issue of factual causation—collectability.

Polaschek contends the addendum did not create any legal limit on PPM's right to mortgage the Oasis property, and that the plaintiffs cannot prove no mortgage lender would have acquired a lien on the Oasis property and foreclosed on it even if American Bank & Trust had not. We conclude this contention misconstrues the plaintiffs' burden at the summary judgment stage. To defeat Polaschek's motion for summary judgment, the plaintiffs need not prove as a matter of law that recording the substance of the addendum would have rendered title to the real estate unmerchantable, as Polaschek suggests. Rather, to prevail at the summary judgment stage, Polaschek must carry the burden of proving no genuine dispute of material fact on the collectability element is engendered from the evidence in the record. This he has failed to accomplish.[7]

The experts' competing visions of the potential practical consequences of incorporating and recording the language from the addendum in the warranty deed requires a trial of the factual causation issue. Therefore, we reverse the district court's order entering summary judgment for Polaschek.

---

[7]Polaschek may be able to persuade a fact finder at trial that a bold mortgage lender might not have been deterred from making a loan to Mark and PPM even if the substance of the addendum had been recorded with the deed. However, this is a fact question that cannot be resolved on this record at the summary judgment stage.

**VI. Conclusion.**

Vossoughi and C, N, & A, Inc. did not suffer actual damage until at least February 2008 when the buyers defaulted on their contract payments. Accordingly, summary judgment in favor of Meloy should not have been granted. The district court also erred in granting summary judgment to Polaschek because a fact question remains for trial on the question whether the substance of the addendum, if recorded, may have deterred a risk-averse lender from extending credit to Mark and PPM and taking a mortgage on the subject real estate. Accordingly, we reverse the district court's summary judgment order and remand for further proceedings.

**REVERSED AND REMANDED**.

All justices concur except Waterman, J., who takes no part.