# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0760
Filed May 13, 2026

———————————

**Scott R. Buss and Julie S. Buss,**
Plaintiffs–Appellants,

v.

**Lana L. Luhring, individually and Lana Luhring d/b/a Laird & Luhring Law Office,**
Defendants–Appellees.

———————————

Appeal from the Iowa District Court for Bremer County,
The Honorable Ashley Sparks, Judge.

———————————

**AFFIRMED**

———————————

Marc S. Harding (argued) and Christian J. Crocker (until withdrawal) of Harding Law Office, Des Moines, attorneys for appellants.

Gregory M. Lederer (argued) and Meredith Rich-Chappell of Lederer Weston Craig PLC, Cedar Rapids, attorneys for appellees.

———————————

Heard at oral argument
by Greer, P.J., and Buller and Langholz, JJ.
Opinion by Langholz, J. Special concurrence by Greer, P.J.

1

**LANGHOLZ, Judge.**

Scott and Julie Buss hired Lana Luhring to draft a ten-year lease with a purchase option for seven grain bins on a farm owned by Scott's parents. The purchase option that Luhring drafted—and the Busses exercised in 2018—did not include any transfer of the land under the grain bins or any easement permitting use of the grain bins. So when the relationship between the Busses and Scott's parents deteriorated, Scott's parents stopped permitting the Busses to access the grain bins in early 2020 and later sold the land to a third party. The Busses unsuccessfully sued Scott's parents and the new landowner seeking an easement for use of the grain bins. And then they filed this suit against Luhring for legal malpractice.[1] They claimed that Luhring was negligent in advising on and drafting the purchase option because she failed to include a transfer of the land under the grain bins or an easement permitting use of the grain bins.

The district court granted Luhring summary judgment. And the Busses appeal, arguing that the court erred in holding that they failed to present any evidence from which the jury could find that Luhring proximately caused their damages. To succeed on their legal-malpractice claim under governing Iowa precedent, the Busses had to show that absent Luhring's alleged negligence, Scott's parents would have agreed to a purchase option that included a transfer of the land under the grain bins or an easement. The summary-judgment record lacks any evidence from which a jury could make that finding without speculation. Julie Buss's conclusory claim in her affidavit that Scott's parents intended the agreement to include a land transfer and easement is not enough. We thus affirm the grant of summary judgment.

---

[1] The Busses also sued Luhring's law office, claiming vicariously liability. For readability, we refer to Luhring and her law office collectively as "Luhring."

## I.

At the Busses' request, Luhring met with the Busses and Scott's parents in 2011 to draft a lease with purchase option for seven large grain bins located on Scott's parents' farmland. The grain-bin lease provided, in part:

> BY THIS AGREEMENT made and entered into on _____, 2011, between Richard Buss and Judy Buss, husband and wife, herein referred to as Lessors, and Scott Buss and Julie Buss, husband and wife, herein referred to as Lessees. Lessors lease to Lessees the 7 grain bins:
>> 3-10,000 bushel,
>> 1-9,000 bushel,
>> 1-26,000 bushel,
>> 1-33,000 bushel, and
>> 1-60,000 bushel
>
> together with the leg, downspouts and dryer all situated on [a particular street address], city of Denver, county of Bremer, state of Iowa, together with all appurtenances, for a term of ten (10) years, to commence on April 1, 2011, and to end on March 31, 2020.

The grain-bin lease also included a purchase option:

> PURCHASE OPTION. It is agreed that Lessees shall have the option to purchase the above described property for the purchase price of $20,000. Lessees shall be given credit for 100% of the rental payments made hereunder as a down payment of the purchase price. This purchase shall be exercised in writing no later than February 1, 2020, but shall not be effective should the Lessees be in default under any terms of this lease or upon any termination of this lease.

Scott's wife, Julie, submitted an affidavit in this case attesting: "All parties to the lease with purchase option intended the real property beneath the grain bins, and an easement to access the grain bins, would be included in the lease with purchase option." But according to Scott's mother, Judy:

> [Scott's father] Richard and I did not intend to grant an easement to [the Busses]. Richard did not intend to create an easement when he entered into

3

the Lease with Scott. . . . At no point in time did Richard nor I ever actually or intend to grant [the Busses] an easement.

And Luhring testified in her deposition that the Busses never "discuss[ed] a desire to have [an] underlying property interest in the grain bins in case they did exercise the purchase option" in the lease.

Along with the grain-bin lease, Luhring drafted a ten-year lease—again with a purchase option—for much of Scott's parents' farming equipment. Luhring did not provide any further legal advice or services to the Busses after she drafted the grain-bin and equipment leases for them in 2011.

At the time they entered the grain-bin lease,[2] the Busses were preparing to take over Scott's parents' farming operation. The Busses had a year-to-year lease agreement[3] with Scott's parents to farm 70 acres of their tillable land. In July 2014, Scott's father signed a document titled "Permission to Access Property" which stated: "Scott Buss has control of the site at the following location [the street address of the grain bins, same as in the lease], Denver, IA for the useful life of technology, which is 30 years." And in February 2018, Scott exercised the purchase option in the grain-bin lease when he and his father executed a "Bill of Sale" for the seven grain bins for "the sum of $4250"—equal to the remaining rent payments owed on that lease. Luhring did not prepare the "Bill of Sale," nor did the Busses consult her for advice before purchasing the grain bins.

Scott's relationship with his parents started to deteriorate sometime between 2018 and 2019. In late 2019, Scott's parents terminated the Busses'

---

[2] The copy of the grain-bin lease in the summary judgment record is not signed, but Scott testified at his deposition that he, Julie, and his parents signed it.

[3] According to Scott's deposition testimony, unlike the grain-bin and equipment leases drafted by Luhring, that lease did not include a purchase option.

year-to-year farming lease agreement. Then, the grain-bin lease expired by its terms in March 2020. According to Scott's mother, when that lease expired, she and Scott's father "offered Scott a chance to enter into a new written lease or at least to become a month-to-month tenant, like the Lease provided, but he refused, instead stating that he wanted an access easement instead of another lease." At that point, Scott's parents refused the Busses access to the grain bins.

In April 2020, the Busses sued Scott's parents for quiet title for a perpetual easement to access the grain bins.[4] While that suit was pending, Scott's parents conveyed a portion of their farmland including their house, several outbuildings, and the road accessing the grain bins to another couple by warranty deed.[5] In August 2022, the district court granted partial summary judgment to Scott's parents, concluding as a matter of law that the Busses "may own the grain bins, but there is nothing in the [grain-bin] lease/purchase agreement which creates an easement," and the Busses did not otherwise establish an easement to access the grain bins. The court thus dismissed the Busses' quiet title claim. In March 2023, the parties reached a settlement agreement providing that the Busses would remove the grain bins from the property. The Busses ultimately sold most of the grain bins at auction.

The Busses then sued Luhring in December 2023. In this suit, they alleged Luhring committed legal malpractice by negligently drafting the grain-bin lease without including "terms in the Purchase Option guaranteeing and/or protecting a possessory or legal interest in the property

---

[4] Luhring did not represent the Busses in that lawsuit.

[5] The Busses amended their petition in June 2021 to add that couple and their bank as defendants.

underlying the Grain Facility"; "terms in the Purchase Option guaranteeing and/or protecting a right-of-way easement through which [the Busses] could maintain access to the property on which the Grain Facility is situated"; or "terms necessary to carry out [the Busses'] goals—to wit preservation of [their] possessory or legal interest in the property underlying the Grain Facility." The Busses also alleged that Luhring was negligent for "[f]ailing to inform [them] that the Purchase Option did not include [those] terms." They claimed that as "a direct and proximate result" of Luhring's negligence, they suffered injuries including "[p]ast and future economic loss" and "[p]ast and future pain and suffering." And they claimed that Luhring's law office was vicariously liable for Luhring's negligence.

Luhring moved for summary judgment, contending that the Busses' claims were barred by the applicable statutes of limitations and that any alleged malpractice by Luhring was not the proximate cause of the Busses' claimed injuries. After a hearing, the district court granted Luhring's motion on the proximate-cause ground and did not address the alternative statute-of-limitations ground. The court acknowledged that "[p]roximate cause is usually a question of fact for the jury." But it concluded that "this [is] a case where the issue of proximate cause can be resolved on summary judgment." The court reasoned in part that there was "no evidence in the record that Scott's parents would have signed the 2011 grain bin lease if it included an easement or property interest." Thus, the court concluded: "Drafting the grain bin lease differently would not have caused a different outcome." And so, the court granted summary judgment for Luhring.

The Busses now appeal.

6

## II.

We review the district court's summary-judgment ruling for correction of errors at law. *Vossoughi v. Polaschek*, 859 N.W.2d 643, 649 (Iowa 2015). "Summary judgment is appropriate when the moving party demonstrates that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law." *Id.*; *see* Iowa R. Civ. P. 1.981(3). The nonmoving "party may not rest upon the mere allegations or denials in the pleadings, but the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Iowa R. Civ. P. 1.981(5).

On our review, we "afford the nonmoving party every legitimate inference that can be reasonably deduced from the evidence." *Vossoughi*, 859 N.W.2d at 649 (cleaned up). But even so, "[s]ummary judgment is not a dress rehearsal or practice run for trial but rather the put up or shut up moment in a lawsuit, when a nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Buboltz v. Birusingh*, 962 N.W.2d 747, 754–55 (Iowa 2021) (cleaned up). "And if, after considering all that evidence in the light most favorable to the nonmoving party, no reasonable mind could differ on how the factual issues should be resolved—and the law applied to those facts compels judgment for the moving party—summary judgment must be granted." *In re Est. of River*, 6 N.W.3d 13, 17–18 (Iowa Ct. App. 2024).

To succeed on a legal-malpractice claim, a plaintiff must establish four elements:

> (1) an attorney-client relationship existed giving rise to a duty; (2) the attorney violated or breached the duty, either by an overt act or a failure to act; (3) the breach of duty proximately caused injury to the client; and (4) the client did sustain an actual injury, loss, or damage.

*Stender v. Blessum*, 897 N.W.2d 491, 502 (Iowa 2017). Only the third element—proximate cause—is at issue here. "The burden of proving proximate cause in a legal malpractice action is the same as any other negligence action." *Blackhawk Bldg. Sys., Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg*, 428 N.W.2d 288, 290 (Iowa 1988). "To recover, the injured [party] must show that, but for the attorney's negligence, the loss would not have occurred." *Id.*

While "questions of proximate cause are generally for the jury and only in exceptional cases may they be decided as matters of law," the "jury cannot be left to speculate, but rather, must be provided with facts affording a reasonable basis for ascertaining the loss." *Id.* at 291; *see also Benton v. Nelsen*, 502 N.W.2d 288, 291–92 (Iowa Ct. App. 1993) (affirming grant of summary judgment on legal-malpractice claims where the plaintiffs "failed to show substantial evidence to support a finding [the attorney's] negligence, if any, was a proximate cause of their being damaged").

In *Blackhawk Building Systems*, our supreme court considered the evidence required to create a jury question on proximate cause for a claim of legal malpractice in advising on and drafting a contract much like the Busses' claim here. There, a corporation sued a law firm and one of its attorneys alleging that they were negligent in drafting an employment agreement between the corporation and its president by failing to include a non-compete clause in the agreement. *Id.* at 289. After the corporation's president resigned, he formed his own company, obtained a franchise the corporation previously held, and became a competitor of the corporation. *Id.* at 290. A short time later, the corporation went out of business. *Id.* A jury returned a verdict for the corporation in its legal-malpractice suit against the law firm,

8

and the firm appealed, contending there was insufficient evidence to submit the proximate-cause question to the jury. *Id.* at 289.

Analyzing that proximate-cause issue, our supreme court explained:

As applied to this situation, plaintiff would be required to show that absent the lawyer's negligence, [the president] would have signed a contract containing a covenant not to compete which would have effectively prevented the . . . subsequent demise of [the corporation]. Essential to this chain of events, the plaintiff must show that [the president] would have agreed to a covenant not to compete.

*Id.* at 290. The court reasoned that the "record [was] devoid of any evidence that would allow the jury to infer that [the president] would have agreed to a non-compete clause." *Id.* at 290–91. And so, the court held that "a jury issue was not engendered on causation," and the "trial court should have directed a verdict for the defendant." *Id.* at 291–92.

We agree with the district court and Luhring that *Blackhawk Building Systems* governs here. To establish the proximate-cause element of their legal-malpractice claim, the Busses must show that absent Luhring's alleged negligence, Scott's parents would have agreed to a purchase option that included a transfer of the land under the grain bins or an easement. *Cf. id.* at 290 ("Essential to this chain of events, the plaintiff must show that Parsons would have agreed to a covenant not to compete."). And at this "put up or shut up moment," they failed to put up any evidence from which a reasonable jury could find that they met that burden. *Buboltz*, 962 N.W.2d at 755 (cleaned up).

The only evidence the Busses produced to possibly support such a finding was the conclusory statement in the affidavit of Scott's wife, Julie, that "[a]ll parties to the lease with purchase option intended the real property beneath the grain bins, and an easement to access the grain bins, would be

included in the lease with purchase option." But while that statement is evidence of Julie's willingness to enter into an agreement with those terms and *her* belief about the intent of each of Scott's parents, it does not give a reasonable jury any basis to find that Scott's parents would have agreed to include those terms without engaging in pure speculation or conjecture.

We are also unpersuaded by the Busses' argument that the "plain language of the lease" is evidence that Scott's parents would have agreed to create an easement or convey an ownership interest in the land beneath the grain bins. Nothing in the lease's purchase option mentioned an easement or landownership interest—the "above described property" it referenced was "the 7 grain bins . . . together with the leg, downspouts and dryer all situated on [a particular street address], city of Denver, county of Bremer, state of Iowa, together with all appurtenances." Neither did the "Bill of Sale" Scott used to exercise the purchase option mention an easement or landownership interest. And the Busses do not dispute that the grain-bin lease with purchase option did not, in fact, include such an interest. So these documents give no basis for the jury to infer that Scott's parents would have agreed to a purchase option that actually included the transfer of land or an easement.

Nor could the jury infer that agreement from the "Joint Statement of Intent" for the Busses to take over the family farming operation signed by the Busses and Scott's parents in March 2011 or the "Permission to Access Property" signed by only Scott's father in July 2014. Neither of those documents created easements or conveyed landownership. Likewise, the Busses' year-to-year farming lease agreement with Scott's parents did not include an option for the Busses to purchase the farmland. And while the "Permission to Access Property" might suggest that at least Scott's father was open to granting a temporary easement, it does not move the needle on

whether his mother would have agreed—and she alone could have prevented an agreement by refusing—or on whether either parent would have agreed to a transfer of land or a permanent easement.

What's more, there is much evidence in the summary-judgment record supporting the contrary conclusion that Scott's parents—or at least his mother—would not have agreed to a purchase option that included a transfer of land or an easement. Scott's mother said in her affidavit that she and Scott's father "did not intend to create an easement when [they] entered into the [grain-bin lease] with Scott," nor did they "ever actually or intend to grant [the Busses] an easement." As Julie herself testified, during the 2011 meeting with Luhring, Scott's mother did not want to "let [the Busses] buy the farm" because "she didn't want to live in a house with somebody else's name on it," and the Busses knew they "weren't going to get to buy the land." And the year-to-year farm lease, which existed at the time the parties executed the grain-bin lease with purchase option and continued until the relationship deteriorated, further shows that Scott's parents were not interested in transferring any ownership of the land in 2011.

Like the district court, we recognize that proximate cause is usually a fact question for the jury. *See Hagen v. Texaco Refin. & Mktg., Inc.,* 526 N.W.2d 531, 538 (Iowa 1995); *Hedges v. Conder*, 166 N.W.2d 844, 854 (Iowa 1969). But even viewing the record in the light most favorable to the Busses—and assuming Luhring was negligent for failing to include an easement or landownership interest in the grain-bin lease's purchase option—no reasonable jury could find that Luhring's negligence proximately caused the Busses' alleged injuries because there is insufficient evidence to show that Scott's parents would have agreed to the lease in 2011 if it had included those terms. *Cf. Blackhawk Bldg. Sys.*, 428 N.W.2d at 290–92 (holding "that a jury

11

issue was not engendered on causation" because the "record [was] devoid of any evidence that would allow the jury to infer that Parsons would have agreed to a non-compete clause"). So the Busses' legal-malpractice claim fails as a matter of law. *See id*. at 290 ("Even though negligence has been established, proximate cause must be determined separately.").

We thus affirm the district court's grant of summary judgment for Luhring because the Busses did not generate a genuine issue of material fact as to the proximate-cause element of their legal-malpractice claim.

**AFFIRMED.**

Greer, P.J., specially concurs with Buller, J., joining.

**GREER, Presiding Judge** (specially concurring).

I concur in the opinion in full but write to draw focus to a question that occurred to me in my review of this case. The majority correctly cites a quotation from current authority from a legal malpractice case: "The burden of proving *proximate cause* in a legal malpractice action is the same as any other negligence action." *Blackhawk Bldg. Sys., Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg*, 428 N.W.2d 288, 290 (Iowa 1988) (emphasis added). I am not sure that quote is still a correct statement of the law. *Thompson v. Kaczinski* changed the essential elements of a negligence action, moving away from the "confusion caused by the traditional vernacular" of proximate cause. 774 N.W.2d 829, 837 (Iowa 2009). Yet even after *Thompson*, the supreme court has continued to repeatedly describe proximate cause as an element of a legal malpractice action. *See, e.g.*, *Clark v. State*, 955 N.W.2d 459, 464 (Iowa 2021); *Stender v. Blessum*, 897 N.W.2d 491, 502 (Iowa 2017). Now, I am left wondering how to reconcile the use of the proximate cause analysis in the legal malpractice arena with other supreme court precedent.

For example, I observe that in formulating the factors to establish legal malpractice our supreme court has discussed the Restatement (Third) of the Law Governing Lawyers § 53 as follows: "A lawyer is liable . . . only if the lawyer's breach of a duty of care or breach of fiduciary duty was a legal cause of injury, as determined under generally applicable principles of causation and damages." *Kraklio v. Simmons*, 909 N.W.2d 427, 441 (Iowa 2018) (specifically adopting this section). Moving from that shift in language, I note that in the medical negligence cases, our supreme court has said:

> We began [in *Thompson*] by noting that a trial court instructing a jury on causation in accordance with the Restatement (Second) of Torts would instruct the jury that "'[t]he actor's negligent conduct is a legal cause of

13

harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability.'" We then noted this traditional approach caused "significant uncertainty and confusion." To eliminate the uncertainty and confusion, we observed that the drafters of the Restatement (Third) addressed factual cause and what was formerly known as proximate cause (and now called scope of liability) separately.

Although sometimes labeled "medical malpractice" actions, a claim that a professional has failed to meet the applicable standard of care is essentially a negligence cause of action. Nothing in the Restatement (Third) suggests its approach to factual causation and scope of liability does not apply to a claim of medical negligence. The introduction to the Restatement (Third) indicates it generally covers negligence actions. Restatement (Third) section 26, comment *n* discusses the applicability of the loss of chance doctrine in medical malpractice actions. Restatement (Third) section 35, comment *a* uses an example of a negligent medical professional in discussing the medical professional's scope of liability. Further, we can discern no reason to except medical negligence actions from the factual cause and scope of liability approach of the Restatement (Third).

*Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 498–99 (Iowa 2014) (internal citations omitted), *overruled on other grounds by*, *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016). So, is the causation analysis in a legal malpractice case distinct from other negligence cases, including medical malpractice? While I agree with the analysis of the majority and its correct application of our current supreme court precedent to the case at hand, I cannot help but question if this legal malpractice distinction involving the use of proximate cause is intentional.

Buller, J., joins this special concurrence.